***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the deputy commissioner and in a pretrial order of November 12, 2002 as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. The parties agree that there was an employee-employer relationship between the employer and the employee on May 10, 2000.
3. The parties agree that the carrier on risk was Reliance National Insurance, however since the date of this claim, Reliance National Insurance has entered bankruptcy, and their claims have been transferred to the North Carolina Insurance Guaranty Association.
4. Sedgwick CMS is the third party administrator of this claim.
5. A Form 60 was filed on March 27, 2001, pursuant to which defendants paid plaintiff disability compensation from March 14, 2001 through September 12, 2001, when compensation was stopped pursuant to a Form 24 filed by Special Deputy Commissioner Myra Griffin which found that plaintiff's disability had ceased on August 9, 2001.
6. Plaintiff's compensation rate based upon her average weekly wage at the time of her injury by accident is $555.76.
7. A pre-trial agreement was received into evidence as Stipulated Exhibit Number One.
8. A packet of medical records was stipulated to as Exhibit Number Two and were received into evidence.
9. Following the hearing before the deputy commissioner the deposition testimony of Nelson Hendler, M.D., Ronald Demas, M.D., Donlin M. Long, M.D., Avraam Karas, M.D., Sheldon Levin, M.D., Nick E. Grivas, M.D., James E. Wright, M.D., Robert W. Elkins, M.D., and Roger K. Hershline, M.D. and their records were submitted and received into evidence.
 ***********
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 36-years old. She had completed high school and two years of college. She had worked as a flight attendant for ten years.
2. On May 10, 2000, plaintiff was employed by defendant-employer as a flight attendant, with an average weekly wage of $833.64 per week, with a compensation rate of $555.76 per week.
3. On May 10, 2000, plaintiff sustained an admittedly compensable injury by accident while helping passengers deplane and board an aircraft in the airport at Philadelphia, Pennsylvania, when lightning struck the metal jet way directly behind her. As a result, lightning entered her body, forced her forward, and caused her to suffer a lightning strike injury. Plaintiff immediately felt a "hot poker feeling" in her right arm and continued to feel a burning in her arm that often felt like "pins and needles".
4. Plaintiff was treated by paramedics at the scene and told to follow up with her regular physician if problems continued. Plaintiff continued to work as a flight attendant for defendant-employer performing her regular job duties for ten months until March 14, 2001.
5. Plaintiff was treated by Jerry Williams, M.D., a neurologist in Greenville, South Carolina, on May 16, 2000 for a previously arranged follow up of a pre-existing neurological condition for which plaintiff complained of "spells". At that time her only complaint was of feeling tightness in her right side. She did not complain of neck pain. When plaintiff was again treated by Dr. Williams on August 25, 2000, her only complaints were of right arm and shoulder pain. Again, there were no complaints of neck pain.
6. Dr. Williams diagnosed her as having an electric shock injury with right upper extremity and shoulder pain, ordered an EMG and Nerve Conduction Study of the bilateral upper extremities and prescribed Trileptal.
7. When plaintiff indicated she needed medical treatment as a result of the lightning strike, plaintiff was treated by Dr. Roger Hershline at Workwell on referral from defendants on August 25, 2000 with complaints of only neck, shoulder and elbow pain. Dr. Hershline recommended therapy and suggested x-rays and an EMG study.
8. The EMG, completed on September 1, 2000, showed a normal study of the right upper extremity. Dr. Williams ordered a lumbar MRI on September 15, 2000, which showed disc degeneration at L5-S1 with mild broad-based disc protrusion, marginal osteophytosis, facet joint degenerative joint disease and mild concentric disc protrusion at L1-2. Dr. Williams initially ordered physical therapy but later changed this to massage therapy.
9. Plaintiff continued treating with both Dr. Williams and Dr. Hershline for her complaints of pain in her neck, right shoulder, arm and elbow.
10. On March 16, 2001 plaintiff underwent a cervical MRI, which showed shallow disc bulges at C4-5 and C5-6 levels. When Dr. Hershline saw plaintiff on March 30, 2001, he diagnosed her as having a cervical strain or cervical disc bulge and electrical shock injury, continued to excuse her from work and referred her to Dr. Nicholas Grivas, a neurosurgeon, to review her cervical condition.
11. Dr. Grivas, chief of surgery at Mercy Hospital in Charlotte, saw plaintiff on April 4, 2001, reviewed the March 16, 2001 cervical spine MRI and performed a physical examination of plaintiff. Plaintiff complained of neck and right shoulder and arm pain. She denied bowel problems at this time, though she later claimed constant diarrhea since February 2001. Dr. Grivas found no neurological deficits or any signs consistent with degenerative disc disease or ruptured disc. He found no evidence that plaintiff suffered from thoracic outlet syndrome or any other surgically correctable abnormality. Dr. Grivas opined that plaintiff appeared overly preoccupied with her physical condition though he tried to reassure her she would improve.
12. Plaintiff returned to Dr. Hershline on April 13, 2001 with complaints of pain in her neck, her shoulder and her arm. She also complained of problems with her memory. Dr. Hershline performed standard clinical memory tests, which she answered correctly. Plaintiff informed Dr. Hershline that she had been scraping and sanding old paint as well as carrying buckets of paint. Dr. Hershline noted that these activities required more exertion than her duties as a flight attendant. He recommended that plaintiff complete two more weeks of physical therapy followed by a return to work. From this point forward, plaintiff's list of claimed symptoms expands dramatically.
13. On May 4, 2001, plaintiff was treated at Maxwell Family Practice where she presented with complaints of fatigue and stomach problems, which she related to her accident.
14. On May 5, 2001, plaintiff began physical therapy treatment with Stewart Titus, Ph.D. of the office of Kurt Gandenberger, M.D. Plaintiff received therapy on May 8, 10, 15, 18, 22, 24, 25, 29, 31 and June 4, 6, 8, 11, 13, 19, 20, 2001. Her list of problems related to her accident had grown to include headaches on the top of her head, generalized muscle aches, excessive gas, diarrhea and loss of emotional control.
15. Plaintiff was seen by Dr. Rebecca Holdren in Greenville, South Carolina on June 8, 2001. Plaintiff complained of whole body pain from head to foot on the right side of her body, as well as abdominal complaints. Dr. Holdren diagnosed plaintiff with Reflex Sympathetic Dystrophy, a diagnosis, which she later admitted she could not substantiate. Dr. Holdren questioned whether there might be a psychological component to plaintiff's condition.
16. Plaintiff was released to return to work without restrictions on July 1, 2001. Defendant-employer had suitable work available for plaintiff at that time.
17. During his treatment of plaintiff, Dr. Hershline noted that she had symptoms of depression and periods of uncontrolled tearfulness in his presence. Dr. Hershline testified that although plaintiff was suffering from depression, he did not refer her to a psychiatrist and only prescribed Zoloft for her depression on her August 2001 visit. Dr. Hershline felt that the depression was not related to the lightning strike injury.
18. Plaintiff learned of the Mensana Clinic in Baltimore, Maryland through a lightning strike survivor's internet website. On July 17, 2001 plaintiff requested a referral from her family physician at the Maxwell Family Practice to the Mensana Clinic.
19. Dr. Nelson Hendler, a board certified psychiatrist, first saw plaintiff at the Mensana Clinic on August 7, 2001. Plaintiff's list of symptoms had expanded to include headaches on top of her head and over her right eye, forehead and ear; right side collar bone and sternum pain; pain between the shoulder blades; pain in the right buttock, hip, calf and back of thigh; numbness in both arms; tingling in the last two fingers of her right hand; a twenty pound weight gain; bladder spasm; clicking in her jaw and right arm trembling. After a brief physical examination and performing only clinical tests, he gave preliminary diagnoses as 1) disk damage at C2-3, C3-4, radiculopathy, and facet syndrome at C2 through C4; 2) L5-S1 level radiculopathy disk and instability, L3 through S1, and facet syndrome; 3) thoracic outlet syndrome; 4) a right rotator cuff tear, labral tear and AC impingement; 5) depression and nonfatal lightning injury with brain damage as a result of the lightning strike of May 10, 2000; 6) tendonitis; 7) ulnar and radial nerve compression; 8) avascular necrosis of the right hip; 9) neurogenic bladder disorder and 10) TMJ. Dr. Hendler ordered another cervical MRI, repeat nerve conduction studies, x-rays of the cervical and lumbar spine, vascular flow studies, discograms and an MRI of the jaw.
20. Defendants filed a Form 24 request on August 9, 2001 requesting that they be allowed to terminate payment of compensation on the grounds that plaintiff was no longer disabled. The Form 24 was approved by Special Deputy Commissioner Myra L. Griffith on September 12, 2001 allowing defendants to terminate payment of compensation.
21. Plaintiff filed a Motion to Reconsider the approval of the Form 24 on October 1, 2001, which was denied on October 16, 2001.
22. After the Commission gave approval for defendants to terminate payment of compensation, plaintiff was evaluated by Dr. Sheldon Levin, a neuropsychologist, who is affiliated with the Mensana Clinic in October 2001 in order to determine whether plaintiff had any neurocognitive disorders related to the lighting event, including memory loss, attention and concentration. Dr. Levin found no evidence of brain damage or other organic neurocognitve impairment. Dr. Levin also had plaintiff perform an MMPI whose results showed plaintiff to have a very high profile for hypochondirasis and histrionic scales. According to Dr. Levin, the MMPI program itself suggested that plaintiff's clinical profile presented a rather mixed pattern of symptoms of which somatic reactivity under stress is a primary difficulty. The report also indicated that an individual with this profile would typically exhibit a neurotic pattern of adjustment and will probably receive a clinical diagnosis of somatization disorder. However, despite his findings, Dr. Levin testified that he declined to make the diagnosis of somatization disorder, because he said that he trusted Dr. Hendler's diagnosis that plaintiff suffered from a physical rather than a mental illness. He concluded this although Dr. Hendler had asked for an independent psychological evaluation in order to validate his treatment. The Full Commission notes a further inconsistency in that Dr. Hendler continued to list brain damage in plaintiff's list of diagnoses despite the clear evidence from Dr. Levin, to whom he had referred plaintiff, that plaintiff suffered no brain damage.
23. Dr. Robert Elkins, a board certified orthopaedist performed an independent medical evaluation on plaintiff on December 11, 2001. Dr. Elkins reviewed plaintiff's prior tests, including her EMG and NCVS (the non-invasive neurodiagnostic studies), x-rays, an MRI of the hip, CT scan of the neck, an MRI of the shoulder and an MRI of the neck, neurocognitive testing, and an MRI of the lumbar spine. Based upon these records, Dr. Elkins concluded that plaintiff was suffering from a probable lightning strike injury and right upper extremity myofascial pain syndrome which he felt were related to her compensable injury, and mild degenerative changes of the neck and back which he did not feel were related. Based upon his examination and review of the medical records, Dr. Elkins disagreed with Dr. Hendler's diagnoses of avascular necrosis of the hip, AC joint impingement, rotator cuff tear and thoracic outlet syndrome. Dr. Elkins further indicated that at the time he saw plaintiff she was at maximum medical improvement and additional surgical or medical treatment would not be helpful. Dr. Elkins' report indicated that he felt plaintiff was disabled from her job as a flight attendant, but that plaintiff was capable of performing light to moderate duty work. His report indicated that an attempt to return to work would have been reasonable and would not have caused further damage.
24. Plaintiff was examined by Dr. Ronald Demas, a board certified neurologist and a board certified psychiatrist on December 20, 2001. Dr. Demas reviewed extensive medical records including those of Dr. Hendler and Dr. Levin. Dr. Demas diagnosed plaintiff with a post-traumatic reaction secondary to lightning strike, and noted that her physical ability was unlimited. Though plaintiff told him her discs were "blown out". He noted the reviewed medical evidence indicated her discs were perfectly normal. He thought plaintiff suffered from no nerve injury, no particular electrical injury at all but felt the blast of air from the lightning. Dr. Demas testified that he felt plaintiff had a somatization disorder, and as evidence cited her overly dramatic descriptions of her symptoms, her refusal to consider that there might be a psychological reason for her problems, and her seeking treatment from more and more physicians. He concluded the lightning itself would not have caused the condition but may have been a precipitating event.
25. Plaintiff was referred to Donlin Long, M.D., a neurologist, by Dr. Hendler. Plaintiff underwent a fusion surgery on May 15, 2002 under the direction of Dr. Long despite the fact that Dr. Long admitted that plaintiff had normal EMG testing and normal cervical imaging studies. The only test undergone by plaintiff that was positive were the provocative disc blocks, which Dr. Long admitted were an entirely subjective series of tests based upon plaintiff's own report of pain relief. Dr. Long admitted that the number of complaints reported by plaintiff on his office questionnaire fit the classic definition of somatization disorder.
26. On November 25, 2002 plaintiff underwent surgery for thoracic outlet syndrome and the resection of one of her ribs on the right side under the direction of Dr. Karas who treated plaintiff upon referral from Dr. Hendler. At that time plaintiff had no complaints of left rib pain. In March 2003 plaintiff underwent a second surgery for thoracic outlet syndrome and at the insistence of plaintiff and her mother, Dr. Karas performed additional resection of ribs on both the right and left side. Since that time, plaintiff has complained of additional pain in her left ribs and has even requested that Dr. Karas perform a third surgery.
27. Based upon the expert testimony of record, the Full Commission gives greater weight to the testimony of Dr. Hershline, Dr. Williams, Dr. Holdren, Dr. Grivas, Dr. Demas and Dr. Elkins than to Dr. Hendler, Dr. Levin, Dr. Long and Dr. Karas. Dr. Williams and Dr. Hershline were plaintiff's primary treating physicians immediately following her May 10, 2000 injury by accident. Dr. Hendler, did not see plaintiff until more than a year after her initial injury. Further, Dr. Hendler has relied on plaintiff's subjective complaints even when they have been contradicted by the documentation provided by her previous physicians. He admitted that he did not review the medical records of plaintiff's prior treating physicians. Dr. Hendler has routinely ignored the objective evidence that has conflicted with his own diagnoses. This includes the objective evidence gathered by his own team of doctors, such as Dr. Levin finding no evidence of any type of brain damage, yet Dr. Hendler insists that plaintiff suffers from brain damage. Dr. Levin, Dr. Long and Dr. Karas have deferred to the opinion of Dr. Hendler even when the objective evidence in their field of specialties has contradicted Dr. Hendler's diagnoses and have performed surgeries at the insistence of plaintiff and her mother. It is further noted that although those surgeries performed have proven unsuccessful in alleviating plaintiff's subjective reports of pain, these doctors nonetheless are willing to perform further surgeries. The greater weight of the evidence shows that plaintiff suffers from somatization disorder, which causes her to turn emotional anxiety into physical complaints.
28. Based upon the evidence of record, the Full Commission finds that the medical treatment received by plaintiff at the Mensana Clinic in Maryland and that medical treatment which was received from any of the doctors to whom Dr. Hendler referred plaintiff, including but not limited to Dr. Levin, Dr. Kara, Dr. Kaplan, Dr. Baugher and Dr. Long was not reasonably required to effect a cure or give relief from the medical condition resulting from plaintiff's compensable accident.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident on May 10, 2000 arising out of and in the course and scope of her employment with defendants. Defendants admitted liability on a Form 60 due to plaintiff sustaining a compensable injury as a result of a lightning strike injury for cervical strain and electric shock. Plaintiff's average weekly wage at the time of her injury by accident was $833.64, yielding a compensation rate of $555.76. N.C. Gen. Stat. §§ 97-2(5); 97-2(6).
2. Plaintiff was compensated for her temporary total disability from March 14, 2001 until September 12, 2001. N.C. Gen. Stat. §§ 97-2(6); 97-29.
3. Plaintiff has failed to establish though competent and credible medical evidence that plaintiff's conditions with which she was diagnosed by Dr. Hendler and by the doctors to whom he referred plaintiff for the treatment of those conditions, which include cervical disc instability and radiculopathy, facet syndrome, right rotator cuff tear, labral tear, AC impingement, tendonitis, thoracic outlet syndrome, rib tip syndrome, ulnar and radial nerve compression, lumbar radiculopathy and facet syndrome, avascular necrosis of the right hip, TMJ, depression, lightning injury with brain damage, encephalopathy and neurogenic bladder, were related to or aggravated by her compensable injury of May 10, 2000 as these diagnoses are contradicted by the objective medical evidence, records and testimony of Dr. Hershline, Dr. Williams, Dr. Grivas, Dr. Elkins, Dr. Demas and Dr. Holdren. Therefore, plaintiff is not entitled to additional medical or indemnity benefits. Hilliard v. Apex CabinetCo., 305 N.C. 593, 290 S.E.2d 682(1982). Id. Watson v. BurlingtonIndustries, 49 N.C. App. 301, 271 S.E.2d 516 (1980), reversed on othergrounds, 304 N.C. 670, 285 S.E.2d 822 (1982).
4. As of July 1, 2001, plaintiff was capable of returning to full-duty work without restrictions. Merely being the "precipitating" or "triggering" event for her somatization disorder does not establish causation. Since plaintiff failed in her burden of proving that, after that date, she remained disabled as a result of the compensable injury of May 10, 2000, she is not entitled to further medical treatment necessary to effect a cure, or give relief, or lessen the period of disability or to additional disability compensation, medical treatment, or vocational assistance. Brewington v. Rigsbee Auto Parts, 69 N.C. App 168,316 S.E.2d 336 (1984). N.C. Gen. Stat. §§ 97-25, 97-29, 97-30.
5. The basis of Defendants' Form 24 Application is meritorious and based on substantial competent and credible evidence of record. Plaintiff is not entitled to indemnity compensation after September 12, 2001, the date upon which the Form 24 was approved. N.C. Gen. Stat. § 97-18.1.
 ***********
Based on the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 ORDER
1. Under the North Carolina Workers' Compensation Act and governing case law, plaintiff's claim for benefits after September 12, 2001, must be and hereby is DENIED.
2. Defendants shall pay the costs.
This the 10th day of August 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
DCS/llc